IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES T. MOORE            :      CIVIL ACTION
                          :
                          :
        v.                :
                          :
ERIC K. SHINSEKI, SECRETARY,  :
UNITED STATES DEPARTMENT OF   :
VETERANS AFFAIRS          :      NO. 10-4463


MEMORANDUM

McLaughlin, J.                          October 25, 2011

        This lawsuit arises from the plaintiff, James T.
Moore's employment with the Department of Veterans Affairs
Medical Center ("VAMC").  In November 2007, Moore's coworker,
Holly Leahy, filed a sexual harassment complaint against him.
After an administrative board investigation, Moore was issued a
notice of proposed removal, which was later reduced to a 14-day
suspension from his job.  Moore, an African-American male,
alleges that the defendant's adverse employment actions against
him were motivated by race or gender, and that the defendant
retaliated against him for filing a complaint with the Equal
Employment Opportunity Commission ("EEOC") in violation of Title
VII of the Civil Rights Act of 1964 ("Title VII").

        The defendant moves for summary judgment under Rule 56
of the Federal Rules of Civil Procedure.  The Court will grant
the defendant's motion.

I.    <u>Factual Background</u>

The facts presented here are undisputed unless otherwise noted.  Disputed facts are read in the light most favorable to the plaintiff, the nonmoving party.  <u>See</u> <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 251 n.12 (3d Cir. 2010).


A.    <u>Moore's Employment at the VA</u>

James T. Moore is an African-American male who has been employed by the VAMC since September 1990.  He started as a mail clerk and rose through the ranks to become lead mail clerk, and then supervisory mail clerk.  Moore assumed his current position as a program support assistant in 2002, following an overall management reorganization.  His responsibilities include coordinating the daily operations in the mail room, ordering supplies, giving advice and instruction, and identifying development and training needs of mail room employees.  <u>See</u> Pl.'s Opp. to Mem. in Supp. of Summ. J. ("Opp."), Decl. of James T. Moore ¶ 1, Ex. A ("Moore Decl."); Mem. in Supp. of Summ. J. ("MSJ"), Moore Dep. 21, 24, 32, Ex. A ("Moore Dep."); <u>id</u>., Hatsis Dep. 6-7, Ex. C ("Hatsis Dep."); Compl. ¶ 8.

Moore is the most senior employee in the mail room.  He reports to Earl Dozier, an African-American male who supervises the mail room and the warehouse.  Earl Dozier, in turn, reports

to Phillip Hatsis, the Vice President of Facilities Management. Moore Dep. 32; Hatsis Dep. 9.


      B.   <u>Holly Leahy's Sexual Harassment Complaint Against Moore</u>

On October 21, 2006, Holly Leahy, a Caucasian female, transferred into the mail room.  Moore Decl. ¶ 4; MSJ, Leahy Dep. 13-14, Ex. F ("Leahy Dep.").  During the next year, Leahy made numerous racial and sexual remarks, including describing an African-American coworker's hair as "Buckwheat," describing young minority girls in the hallway as "acting like sluts," talking about lap dances for her boyfriend's birthday party, saying that "Barack" means "terrorist," and referring to Moore as "Jamesie Poo."  <u>See</u> Opp., Admin. Bd. of Investig. Rept. 4, Ex. 25 ("Admin. Bd. Rept."); <u>id</u>., Stmt. of Clifford Pearsall, Ex. 27; <u>id</u>., Stmt. of Harry L. Maxwell, Ex. 28; Moore Decl. ¶¶ 5-6.

On November 19, 2007, Leahy complained to her direct supervisor, Earl Dozier, that Clifford Pearsall, another African-American male employee in the mail room, had created a hostile work environment for her.  MSJ, Dep't of VA Rept. of Contact at VA00138, Ex. B.

The following day, Leahy approached Earl Dozier again, this time to complain about Moore.  According to Dozier, Leahy was "hysterical" as she described the incidents with Moore.  MSJ, Dozier Dep. 10-13, Ex. G ("Dozier Dep.").  Leahy gave Dozier a

written statement claiming that Moore called her "my little white girl," implied that he was going to hit her, squeezed the back of her neck, put her in a headlock, and told her he wanted to "bend [her] over and ram it in."[1]  Id., Ltr. from Holly Leahy to Earl Dozier at VA000139, Ex. B.

Dozier brought Leahy to the Department of Veterans Affairs ("VA") police.  After Leahy repeated her allegations about Moore to the police, she was temporarily removed from the mail room and reassigned to the warehouse.  The VA police conducted follow-up interviews with various mail room employees, then referred the case to the Administrative Board of Investigation (the "Board") for further review.  The VA police report also recommended that all mail room employees, including Leahy, be given sensitivity training.  See Opp., Uniform Offense Rept. 7, Ex. 1.

Leahy's complaints against Pearsall and Moore prompted Richard Citron, Director of the Philadelphia VAMC, to order the Board to investigate.  Reply Mem. in Supp. of MSJ ("Reply"), Citron Aff. ¶¶ 2, 5, Ex. 7 ("Citron Aff.").

---

[1] It is undisputed that Leahy made these allegations, but the truth of the allegations themselves is disputed.  Michelle Dade, a mail room employee, testified that she heard Moore refer to Leahy as his little white friend.  MSJ, Dade Dep. 11-12, Ex. F.  Moore denied all of Leahy's allegations.  Moore Dep. 84; Moore Decl. ¶¶ 7-8.

C.   The Board's Feb. 8, 2008 Findings, Conclusions, and
     Recommendations

From November 2007 to February 2008, the Board
interviewed 14 witnesses and reviewed documents.  In his
testimony before the Board on December 18, 2007 and January 18,
2008, Moore denied all of Leahy's allegations against him.  See
Admin Bd. Rept., Exhibit Listings; see id. at 3.  Leahy admitted
to the Board investigators that she participated in discussions
of a racial or sexual nature.  In particular, she admitted to
discussing lap dancing, calling Moore "Jamesie Poo," and making
the "Buckwheat" comment.  Id. at 4.

On February 8, 2008, the Board issued a report
containing findings, conclusions, and recommendations regarding
Leahy's allegations.  As to the allegations that Clifford
Pearsall created a hostile work environment, the Board found that
Leahy's allegations were unsubstantiated.

As to Leahy's allegations of sexual harassment and
hostile work environment against Moore, however, the Board found
the following: (1) Moore's testimony was dishonest; (2) Leahy was
a credible witness, who openly admitted her own participation in
discussions of a sexual and racial nature; (3) Moore made
degrading comments to Leahy by calling her "my little white girl"
and "Elly May Clampett"[2]; (4) Moore made unwanted sexual advances

_____

[2] Elly May Clampett is a tomboy character from the TV show
"Beverly Hillbillies."

5

toward Leahy by telling her that he wanted to bend her over and "ram it in"; and (5) Moore told Leahy he would punish her and told others to leave the room so he could take his belt off.  The Board could not substantiate Leahy's allegations that Moore made physical contact with Leahy, but it stated that "this behavior was consistent with other behaviors that were substantiated." Admin. Bd. Rept. 1-4.

Based on these findings, the Board concluded that there was sufficient evidence that Moore's conduct was inappropriate, violated the VA sexual harassment policy, and created a hostile work environment for Leahy, who perceived him as the "lead" or supervisor in the mail room.  Further, the Board found that Moore had made "intentional misstatements in sworn testimony to an investigative body."[3]  Id. at 8-9.

The Board referred its report to the VA Human Resources department ("HR") for appropriate administrative action against Moore.  In addition, the Board recommended training for all mail room employees regarding hostile work environments, workplace violence, sexual harassment, and cultural sensitivity.  Id. at 9-10.  Holly Leahy was not disciplined.

---

[3] The Board also found that Earl Dozier had failed to adequately supervise the mail room and referred the matter to Human Resources for appropriate administrative action.  Admin Bd. Rept. 5-6.

D.    Actions of VA Management Following the February 2, 2008
      Report

On February 19, 2008, Richard Citron, Director of the

Philadelphia VAMC, sent a memo to the director of HR, outlining

the Board's recommendations and requesting that HR prepare an

action plan and time line within 30 days.  Similarly, on February

26, 2008, Ahmed Hassan, who supervises Earl Dozier, contacted the

HR department and requested a recommendation on corrective action

against James Moore and Earl Dozier.  Opp., Memo from Richard

Citron to Director of Human Resources, Ex. 46; MSJ, Memo from

Ahmed Hassan at VA00162, Ex. B.

In addition, pursuant to the Board's recommendations,

Hassan set up a training for everyone in the mail room and the

warehouse.  Moore refused to attend the training.  Thus, on April

1, 2008, Hassan emailed Moore individually, directing him to

attend the training.  MSJ, Hassan Dep. 8, Ex. D; Opp., Ex. 3.


E.    Moore's EEO Activity

Moore became upset when Hassan instructed him to attend

the sexual harassment training.  Thus, on April 9, 2008, Moore

contacted an EEO counselor.  Moore claimed that he was

discriminated against when he was informed he needed to attend

the training.  See Moore Decl. ¶¶ 18-19; Opp., Exs. 7, 8, 9, 30.

On April 22, 2008, Moore signed an expression of

interest in alternative dispute resolution regarding his EEO

7

claims against the VAMC.  One week later, on April 29, 2008, Director Citron signed an agreement to mediate.  Opp., Exs. 4, 5; Citron Dep. 34-35.

According to Moore, during the informal mediation process, Citron requested that Moore withdraw his EEO action in exchange for the VA not issuing further discipline.[4]  Moore refused Citron's proposed resolution of his complaint and insisted on proceeding with his EEO complaint.  On May 8, 2008, the EEO counselor gave Moore notice of the end of EEO counseling and of his right to file a formal EEO complaint.  See Moore Decl. ¶ 20; Opp., Ex. 6.

On May 21, 2008, Moore filed a formal EEO complaint after receiving a notice of right to file from the EEO counselor. Opp., Exs. 6, 31, 32.  On June 23, 2008, the defendant dismissed Moore's EEO complaint.  Opp., Ex. 8.

---

[4] It is disputed whether Citron participated in the informal mediation sessions with Moore.  The documents show that Citron signed an agreement to mediate.  However, Citron testified that he did not participate in attempts to mediate because "that would have been inappropriate."  Citron Dep. 32.  Citron attests that he is generally informed about EEO complaints as part of his role as Director, but that he was not specifically aware of Moore's EEO history at the time he considered the mitigating evidence. Citron Aff. ¶ 19.  The Court takes as true Moore's recitation of the facts, as set forth in his declaration.

F.     <u>VA Administrative Action Against Moore</u>

On June 24, 2008, one day after the VA dismissed
Moore's EEO complaint, Moore received a notice of proposed
removal from Phillip Hatsis, the Vice President of Facilities
Management.[5]  The notice informed Moore that the VA proposed to
remove him based on inappropriate comments of a sexual nature,
inappropriate comments regarding Leahy's appearance,
inappropriate physical contact, and lack of candor to the Board.
The notice also informed Moore that he could present mitigating
evidence to Director Citron, the final decision-maker.  Opp.,
Ltr. from Phillip Hatsis to James Moore, Ex. 9 ("Proposed Removal
Notice").

On July 14, 2008, Moore and his then-attorney met with
Director Citron regarding the notice of proposed removal.  Moore
presented mitigating evidence to Citron but did not mention that
he had filed an EEO complaint.  Citron Aff. ¶¶ 17-18; Moore Dep.
138, 143; MSJ, Ex. B at VA00217-22, VA01313.

---

[5] Director Citron attests that from April to June 2008, the
HR department was considering options for administrative action
against Moore under VA policy.  Moore provides no evidence to the
contrary.  However, it does not appear that Citron has personal
knowledge of this fact.  Citron's affidavit suggests that this
fact was his "understanding."  Citron Aff. ¶ 12.  No members of
the HR department were deposed.
    The government does not point to anything else in the record
that supports its contention that the VA was actively considering
disciplinary action against Moore (other than the sexual
harassment training) prior to issuing the June 24, 2008 notice of
proposed removal.

On July 23, 2008, the VA's regional counsel reviewed Moore's paper file in connection with a FOIA request.  The regional counsel's memorandum recommended against removing Moore from employment.  Counsel stated: "[T]here is no reason to remove Moore unless you also remove Leahy.  She was an active and willing participant until, for reasons known only to her, she decided not to be . . . .  Her conduct was no better than his.  I don't see how removal will stand on these facts."  Opp., Ex. 48.

Ultimately, Director Citron decided to mitigate Moore's discipline from removal to a 14-day suspension, a lesser penalty on the spectrum of penalties suggested by the VA Handbook for a first offense of sexual harassment.  In doing so, Citron considered, among other things, Moore's years of federal service and the fact that Leahy herself had participated in the inappropriate comments and remarks along with Moore.[6]  See Citron Aff. ¶¶ 22-27; Opp., Citron Dep. 58-60, Ex. C ("Citron Dep."); id., VA Handbook Table of Penalties, Ex. 39.

On September 2, 2008, Moore received Director Citron's decision to mitigate the penalty of removal to a 14-day suspension.  Opp., Ex. 10.  On September 9, 2008, Moore contacted an EEO counselor regarding his suspension.  He filed a formal EEO complaint regarding his notice of proposed removal and 14-day

---

[6] It is unclear from the record whether Citron considered the memorandum from regional counsel, which was addressed to "Jose."

10

suspension on November 8, 2008.  Opp., Ex. 41; MSJ, Ex. B at
VA00030-31.


II.  <u>Analysis</u>

     A.  <u>Legal Standard</u>

          Summary judgment is appropriate if there is "no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving
party bears the initial burden of informing the court of the
basis for its motion.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
323 (1986).  The party may meet that burden by showing that the
party who bears the burden of proof lacks sufficient evidence to
support his case.  <u>See</u> <u>id</u>.  Once a party files a properly
supported motion for summary judgment, the burden shifts to the
nonmoving party, who must set forth specific facts showing that
there is a genuine issue of material fact for trial.  <u>Anderson v.
Liberty v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

          A fact is "material" if it might affect the outcome of
the suit under the governing law.  <u>Id</u>. at 248.  A dispute is
genuine if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party.  <u>Id</u>.  The court must
view the facts in the light most favorable to the nonmoving
party.  <u>See</u> <u>Sheridan v. NGK Metals Corp.</u>, 609 F.3d 239, 251 n.12
(3d Cir. 2010).

B.   Legal Framework

Where there is no direct evidence of discrimination, the Third Circuit analyzes Title VII claims under the burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006).  Under that framework, the plaintiff must first establish a prima facie case of discrimination.  If the plaintiff succeeds in doing so, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas, 411 U.S. at 802.  Finally, if defendant carries its burden, the plaintiff must have the opportunity to prove that the reasons offered by the defendant were not its true reasons, but rather a pretext for discrimination.  See Moore, 461 F.3d at 342.

C.   Prima Facie Case

Moore has failed to make out a prima facie case for either his race or gender discrimination, or for his retaliation claim under Title VII.

1.   Race or Gender Discrimination

To establish a prima facie case for discrimination, the plaintiff must demonstrate four factors: (1) membership in a

protected group; (2) qualification for the job in question; (3) adverse employment action; and (4) circumstances that support an inference of discrimination. <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002). Only the fourth factor is in dispute in this case. A plaintiff may demonstrate an inference of discrimination by showing that others not in the protected class but similarly situated were treated more favorably. <u>See</u> <u>Roebuck v. Drexel Univ.</u>, 852 F.2d 715, 726 (3d Cir. 1988); <u>Houston v. Easton Area Sch. Dist.</u>, 355 F. App'x 651, 654 (3d Cir. 2009).

Quite simply, there is no evidence that race or gender was a factor in either the Board's administrative recommendation or Director Citron's decision to suspend Moore. Moore admitted in his deposition that he has no evidence to show that the Board discriminated against him on the basis of race or gender, and that he has no knowledge of what factors the Board considered in making its recommendation. <u>See</u> Moore Dep. 116-117. The only evidence Moore proffers in support of an inference of discrimination is evidence regarding treatment of five alleged comparators. However, none of Moore's alleged comparators is actually comparable.

First, Holly Leahy was found to be a credible witness during the Board investigation, whereas the Board found that Moore made "intentional misstatements in sworn testimony to an investigative body." Admin. Bd. Rept. 9. In addition, Leahy and

Moore were not of similar rank, as Moore was the lead employee in the mail room at a GS-7 paygrade.  Director Citron thus had higher expectations of Moore's behavior.  See Citron Aff. ¶ 25; Citron Dep. 58-60.

The second alleged comparator, Joseph Delossi, a Caucasian male, was overheard using the phrase "your sister's cunt" by a female employee.  After an investigation, the Board found that Delossi, unlike Moore, had not directed his offensive comments toward the female employee.  Even if he were a comparator, however, Delossi was, in fact, disciplined for his vulgarity with a 3-day suspension.  Hatsis Dep. 16-17.

The third alleged comparator, Larry Silverman, a Caucasian male, was accused of getting into a verbal argument with a female employee, of being physically intimidating, and of calling her "dumb" and "stupid."  There were no allegations of sexual harassment.  Opp., Lomax Dep. 7-12, 18, Ex. H.  Because there is no evidence in the record that the allegations against Silverman were substantiated by the Board, the VA's treatment of Silverman has no bearing on its treatment of Moore.

Lastly, the Board found no sexual harassment in the cases of the two unnamed Caucasian men.  In two unrelated incidents, two female employees alleged that their respective supervisors had sexually harassed them.  However, the Board investigated both incidents and found no sexual harassment in

either.  See Citron Dep. 14-19.  The VA's treatment of these
unnamed Caucasian men is therefore not comparable to its
treatment of Moore, against whom the Board substantiated
allegations of sexual harassment and recommended administrative
action.

Whether the Board erred in crediting Leahy's testimony
and discrediting Moore's is not the question before the Court.
Rather, the question is whether Citron's decision to rely on the
Board's findings and discipline Moore was made based on his race
or gender.  Here, Moore has presented no evidence supporting an
inference that either the Board or Director Citron acted based on
Moore's race or gender.

Therefore, the Court grants summary judgment on Moore's
race and gender claims for failure to make out a prima facie case
of discrimination.


    2.  Retaliation

To establish a claim for retaliation under Title VII, a
plaintiff must demonstrate that: (1) he engaged in activity
protected by Title VII; (2) the employer took an adverse
employment action against him; and (3) there was a causal
connection between participation in the protected activity and
the adverse employment action.  Weston v. Pennsylvania, 251 F.3d
420, 430 (3d Cir. 2001).  Here, there is no dispute that Moore

contacted an EEO counselor on April 9, 2008 and filed a formal
EEO complaint on May 21, 2008.  The second and third elements,
however, are contested.

      a.   Adverse Employment Action

A plaintiff alleging retaliation in violation of Title
VII must show that "a reasonable employee would have found the
challenged action materially adverse, which . . . means it well
might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." Burlington Northern &
Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). See also id.
at 72-73 (holding that the jury's conclusion that a 37-day
suspension without pay was an adverse employment action was
reasonable.

The plaintiff argues that he suffered adverse
employment actions in the form of: (1) the notice of proposed
removal issued on June 24, 2008 and (2) the 14-day unpaid
suspension issued on September 2, 2008.  The defendant argues
that the 14-day unpaid suspension does not qualify as an adverse
employment action.  MSJ at 19-20.

Although the defendant has not made an argument
regarding the notice of proposed removal, the Court notes that
district courts have held that such notices do not constitute
adverse employment actions.  See, e.g., Niimi-Montalbo v. White,

243 F. Supp. 2d 1109, 1128 (D. Haw. 2003) (notice of proposed removal not sufficiently final to constitute an adverse employment action); Gonzalez v. Potter, No. 10-1461, 2010 WL 2196287, at *6 (W.D. Pa. June 1, 2010) (notice of proposed termination does not constitute adverse employment action); Gannon v. Potter, No. 05-2299, 2006 WL 3422215, at *4 (N.D. Cal. Nov. 28, 2006) (same); cf. Hardy v. Potter, 191 F. Supp. 2d 873, 882-83 (E.D. Mich. 2002) (notice of proposed removal was not an adverse action under the Rehabilitation Act).

By contrast, although the Third Circuit has not so opined in a published opinion,[7] case law suggests that a 14-day suspension without pay would dissuade a reasonable worker from making a discrimination charge and, thus, would constitute an adverse employment action. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001) (suspension without pay for 1 week constituted adverse employment action); Russell v. Bd. of Trustees, 243 F.3d 336, 341 (7th Cir. 2001) (five-day suspension); Parkinson v. Anne Arundel Med. Ctr., Inc., 214 F. Supp. 2d 511, 518 (D. Md. 2002) (one-day suspension); Prise v.

---

[7] In McCullers v. Napolitano, the Third Circuit explained in dicta that it was "not persuaded that [a 14-day suspension, among other events] would have dissuaded a reasonable worker from engaging in protected EEO activity." 427 F. App'x 190, 196 (3d Cir. 2011). However, in a different case, the Third Circuit suggested in dicta that a 3-day suspension without pay may be considered an adverse employment action. See Seeney v. Elwyn, Inc., 409 F. App'x 570, 574 (3d Cir. 2011) (citing Russell v. Bd. of Trustees, 243 F.3d 336, 341 (7th Cir. 2001)).

Alderwoods Group, Inc., No. 06-1470, 2011 WL 3047629, at *8 (W.D.
Pa. July 25, 2011) ("[A]n unpaid suspension - under most
circumstances - rises to the level of a materially adverse
employment action.") (internal quotation marks and citations
omitted); Klopfenstein v. Nat'l Sales & Supply, LLC, No. 07-4004,
2008 WL 2331948, at *5 (E.D. Pa. June 5, 2008) (agreeing that a
suspension can amount to an adverse employment action).

        Nevertheless, because the Court finds below that there
is no causal connection between Moore's protected EEO activity
and either the notice of proposed removal or the 14-day
suspension, the Court need not and does not decide the question
of whether the two actions are materially adverse.


        b.   Causal Connection

        The defendant argues that Moore failed to establish a
causal connection between his protected EEO activity and the
adverse employment actions against him.  The Court agrees.

        The Third Circuit has stated that "temporal proximity
between the protected activity and the [adverse action] is
sufficient to establish a causal link." Woodson v. Scott Paper
Co., 109 F.3d 913, 920 (3d Cir. 1997) (citing Jalil v. Avdel
Corp., 873 F.2d 701, 708 (3d Cir. 1989)).  However, "the timing
of the alleged retaliatory action must be unusually suggestive of
retaliatory motive before a causal link will be inferred."

<u>Williams v. Philadelphia Housing Auth. Police Dept.</u>, 380 F.3d
751, 760 (3d Cir. 2004) (citing <u>Shellenberger v. Summit Bancorp,</u>
<u>Inc.</u>, 318 F.3d 183, 189 n.9 (3d Cir. 2003)).  In <u>Jalil</u>, the Third
Circuit found that a two-day period between the defendant's
receipt of notice about the plaintiff's protected activity and
the adverse action was unduly suggestive of a causal connection.
873 F.3d at 708.  In <u>Shellenberger</u>, a period of ten days,
combined with other evidence of retaliation, sufficed.  318 F.3d
at 189.  However, the Third Circuit found that two months were
not unduly suggestive of a causal link.  <u>Williams</u>, 380 F.3d at
760.

In this case, the Board issued its report in February
2008, two months before Moore sought EEO counseling on April 9,
2008.  The Board members therefore could not have retaliated
against Moore's later-initiated EEO activity.  There is also no
indication in the record that the Board knew about Moore's prior
history of EEO activity.

As to Director Citron, Moore argues that the June 24,
2008 notice of removal was issued only one day after the agency
dismissed his formal EEO complaint on June 23, 2008.[8]  The
defendant argues that where discipline is contemplated before the
protected activity, the employer can defeat any inference of

---

[8] The Court assumes for the purposes of deciding the prima
facie case that a notice of proposed removal is an adverse
employment action.

causal connection.  <u>See</u> MSJ at 19.  As a factual matter, however, there is no competent evidence that the VA contemplated discipline for Moore beyond sexual harassment training for all mail room employees between April 9, 2008, when Moore initiated the informal EEO complaint process, and June 24, 2008, when the notice of proposed removal issued.

The defendant cites the affidavit of Director Citron for the proposition that the HR department was considering discipline for Moore throughout April, May, and June 2008.  <u>See</u> Citron Aff. ¶ 12.  However, there is no indication that Citron had personal knowledge of HR's activities during this time period.  Indeed, Citron's own qualification that it is "[his] <u>understanding</u> that the Human Resources department consulted with Phillip Hatsis . . . in determining any proposed discipline for Moore" suggests that Citron, in fact, had no personal knowledge. <u>Id</u>. (emphasis added).  Therefore, Citron's affidavit cannot, by itself, defeat a prima facie case for retaliation.

Nevertheless, the Court finds that Moore has failed to establish a prima facie case that Citron retaliated against him for his EEO activity for four reasons.

First, the record does not show that Director Citron was involved in the preliminary decision to issue a notice of

proposed removal.[9]  Rather, Phillip Hatsis sent the notice, and

there is no evidence in the record that Hatsis was aware of

Moore's EEO activity.  <u>See</u> Proposed Removal Notice 4.

Second, even if Citron directed Hatsis to send the

notice of proposed removal on June 24, 2008, the relevant event

for causation purposes is the defendant's receipt of notice

regarding the plaintiff's EEO activity, not the date of the

agency's decision on the EEO complaint.  <u>See</u> <u>Jalil</u>, 873 F.2d at

708.  Here, the record shows that Director Citron signed an

agreement to mediate Moore's EEO dispute on April 29, 2008.[10]

Opp., Ex. 5.  Although Citron attests that he was not

specifically aware of Moore's EEO activity while making the

decision to suspend, the Court must draw all factual inferences

in the non-moving party's favor.  A jury could reasonably infer

based on Citron's signature on the mediation agreement that he

---

[9] Moore claims that Ahmed Hassan said that Citron made the
decision to issue the notice of removal.  Pl.'s Concise Stmt. of
Disp. Facts in Opp. to MSJ ¶ 78.  In fact, Earl Dozier testified
that he was "<u>assuming</u>, based on what [Ahmed Hassan] was telling
[him]," that the Board and Citron made the decision.  Opp.,
Dozier Dep. 46, Ex. D (emphasis added).

[10] The Third Circuit has considered informal activity for
notice purposes in evaluating temporal proximity.  <u>See</u> <u>Andreoli
v. Gates</u>, 482 F.3d 641, 650 (3d Cir. 2007).  Here, Moore
initiated informal EEO activity on April 9, 2008, when he
complained to an EEO counselor about race and gender
discrimination.  Opp., Exs. 6-9, 30.  However, April 29, 2008 is
the earliest date for which the record could reasonably support
an inference that Director Citron was aware of the EEO activity.

was aware of Moore's informal EEO activity as of April 29, 2008. On June 24, 2008, a few days short of two months after Citron signed the mediation agreement, Moore received a notice of proposed removal from Phillip Hatsis.  The timing here - nearly two months between Citron's notice of Moore's EEO activity on April 29, 2008 and the notice of proposed removal on June 24, 2008 - is not unduly suggestive of a causal connection under Third Circuit precedent.  See Williams, 380 F.3d at 760 (two months not unduly suggestive of causal link).

Lastly, even if the relevant event for causation purposes were the defendant's receipt of the agency's decision on the EEO complaint, the record shows that the letter notifying Citron of the dismissal of Moore's complaint was time-stamped after the issuance of the notice of proposed removal, thus rendering a retaliatory motive impossible.  See Reply, Ltr. from Robyn Labombarda, Regional EEO Officer, to Richard S. Citron, Ex. 12 (time stamp indicating receipt on July 2, 2008).

Therefore, the Court finds that Moore has failed to make out a prima facie case for retaliation.

D.   Legitimate, Non-Pretextual Reason for Adverse Employment Action

Even assuming that Moore had established a prima facie case on either his discrimination or retaliation claims, the defendant has met its burden to provide a legitimate, non-

discriminatory reason for Moore's suspension.  The Board's
February 2008 report found that Leahy's allegations of sexual
harassment were substantiated and that Moore had been dishonest
while under oath.  Based on the Board's recommendations for
action, but after considering mitigating evidence, Director
Citron recommended a 14-day suspension.

Moore has not shown that the VA's proffered reasons for
his suspension were pretextual.  To defeat a motion for summary
judgment where a defendant has offered a legitimate, non-
discriminatory reason for an adverse employment action, "the
plaintiff must point to some evidence, direct or circumstantial,
from which a factfinder could reasonably either (1) disbelieve
the employer's articulated legitimate reasons; or (2) believe
that an invidious discriminatory reason was more likely than not
a motivating or determinative cause of the employer's action."
Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  These are
two ways by which the plaintiff can prove that the defendant's
reasons was pretextual.


        1.   First Pretext Test: Discrediting the Employer's
             Reason

To discredit the employer's articulated reasons, "the
plaintiff cannot simply show that the employer's decision was
wrong or mistaken."  Id. at 765.  "Rather, the non-moving
plaintiff must demonstrate such weaknesses, implausibilities,

23

inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a
reasonable factfinder could rationally find them 'unworthy of
credence . . . . '"  Id. (quoting Ezold v. Wolf, Block, Schorr &
Solis-Cohen, 983 F.2d 509, 531 (3d Cir.1992)).  The plaintiff
must show by a preponderance of the evidence "not merely that the
employer's proffered reason was wrong, but that it was so plainly
wrong that it cannot have been the employer's real reason."
Keller v. Orix Cred. Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir.
1997).

　　　Here, Moore has failed to meet the standard under
Fuentes for discrediting the articulated reasons for his
suspension.  The Board found, after conducting months of
interviews and document review, that Leahy's allegations of
sexual harassment against Moore were largely substantiated, and
that Moore had not been truthful in his testimony before the
Board.  See generally Admin. Bd. Rept.  Moore's notice of
proposed removal and, later, his 14-day suspension were based on
the Board's findings and recommendations.  Even if the Board's
findings and recommendations were wrong, as Moore argues, and
despite the VA regional counsel's misgivings about the Board's
findings, the facts do not suggest that the defendant's reliance
on the Board's report was not the real reason for Moore's
proposed removal and ultimate suspension.  Cf. Watson v. SEPTA,

24

207 F.3d 207, 222 (3d Cir. 2000) ("[I]f an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable . . . just because it turns out that the employee did not steal the funds and that the employer's reason for the discharge was in this sense not 'true.'").

      2.   Second Pretext Test: An Invidious Discriminatory
           Reason Was More Likely Than Not a Motivating
           Factor

The plaintiff must "point to evidence with sufficient probative force for a factfinder" to make the conclusion that an invidious discriminatory reason was more likely than not a motivating factor for the adverse employment action. Simpson v. Kay Jewelers, 142 F.3d 639, 644-45 (3d Cir. 1998) (internal quotations omitted).  One example of such evidence is more favorable treatment of other employees not exercising the same right.  See id.

Moore fails to proffer any evidence of favorable treatment of other similarly situated employees not exercising the same right.  As discussed above, the comparators that Moore suggests are not true comparators and, in any case, relate only to his race or gender discrimination, not to the exercise of protected activity under Title VII.

Therefore, even if Moore made out a prima facie case for either race or gender discrimination or retaliation under Title VII, he has failed to demonstrate that the defendant's proffered reasons for the adverse employment actions were pretextual.  The Court therefore grants summary judgment in favor of the defendant.

An appropriate order follows separately.